IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>BRIDGETTE CROWELL,<br><br>*Defendant*. | Case No. 1:24-cr-262 (TSC) |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, through the undersigned counsel, respectfully submits the following sentencing memorandum. Defendant Bridgette Crowell pled guilty to participating in a multiyear conspiracy through which she abused her position of public trust to enrich herself and her co-conspirators. This serious criminal offense was carried out through fraud and rooted in greed. The parties' pre-indictment resolution and agreed-upon estimated guideline range under the United States Sentencing Guidelines ("U.S.S.G.") already factors in Crowell's early acceptance of responsibility and lack of criminal history. To address the gravity of her offense and sufficiently deter other public servants from similar acts of corruption, the Court should impose a guideline sentence of between 21- and 27-months imprisonment.

I. **RELEVANT BACKGROUND**

    a. **Crowell's Criminal Conduct**

        i. **Introduction to Scheme at WMATA**

Crowell's guilty plea is based on her misconduct at the District of Columbia's Office of Contracting and Procurement ("OCP"). But as suggested in her Statement of Offense, she was introduced to the corrupt scheme while employed at the Washington Metropolitan Area Transit Authority ("WMATA"). *See* ECF No. 8 at ¶¶ 10-11.

1

Crowell worked at WMATA from July 2016 through mid-January 2019. During that time, she served as a WMATA contract administrator. This was an entry level job, but it gave her several responsibilities related to the planning, solicitation, award, and modification of WMATA contracts.

While at WMATA, Crowell met Obinna Ogbu, who worked in information technology ("IT") for WMATA. The two began a romantic relationship in 2017. *See id*. at ¶ 4.

Ogbu was friends with Ifediora Oli. As early as 2015, Ogbu and Oli were seeking to do business as a private company called Highbury Global Group, Inc. ("Highbury"). Ogbu and Oli began conspiring in 2018 to use Ogbu's official position at WMATA and his access to Crowell to steer WMATA business to Highbury. *See United States v. Ogbu*, Case No. 24-cr-255 (TSC), ECF No. 7 at ¶ 8; *United States v. Oli*, Case No. 24-cr-275 (TSC), ECF No. 19 at ¶ 8.

Crowell admits that she understood by 2021 that Ogbu was misusing his official position at WMATA to benefit Highbury and that he was receiving things of value in exchange. *See* ECF No. 8 at ¶ 11. Records obtained in the Government's investigation show that Ogbu introduced Crowell to Oli and Highbury in February 2018. A March 2018 exchange between Crowell and Ogbu regarding Highbury suggests that Crowell (whether knowing about the illicit arrangement or not) was already beginning to take steps to benefit her future co-conspirators' scheme:[1]

| Date | Sender | Message |
| --- | --- | --- |
| 03/06/2018 9:02pm | Ogbu | Did you get the email from my guy? |
| 03/06/2018 9:02pm | Ogbu | Highbury global |
| 03/06/2018 9:04pm | Crowell | Yes I will take care of it tomorrow make sure he is all good |

---

[1] The relevant Crowell/Ogbu 2018 communications as received by investigators, plus redactions to remove personal identifying information, are enclosed as Exhibit 1.

2

A month later, in late-April 2018, Crowell and Ogbu had an exchange about the execution of a WMATA contract involving Highbury and Ogbu's concern that he "just [didn't] want to lose the money." Ex. 1. Later in the conversation, the two exchanged the following messages:

| Date | Sender | Message |
| --- | --- | --- |
| 04/27/2018 4:28pm | Crowell | Oh really so where we going lol |
| 04/27/2018 4:28pm | Ogbu | You tell me |
| 04/27/2018 4:29pm | Crowell | Aruba …. I love that place |
| 04/27/2018 4:29pm | Ogbu | Money babes |
| 04/27/2018 4:29pm | Ogbu | Wish I could |
| 04/27/2018 4:31pm | Crowell | Why doesn't he want [WMATA employee] to be the operation supervisor |
| 04/27/2018 4:32pm | Crowell | The money is coming |

Though perhaps open to interpretation and not part of Crowell's agreed upon Statement of Offense, these messages indicate that Crowell had a working knowledge of Ogbu's involvement in the Highbury scheme and his potential to benefit from it as early as 2018.

### ii. Transition to OCP

Crowell left WMATA and began working at OCP in January 2019. At OCP, she served as a contract specialist. This was a promotion from her job at WMATA. In her more senior job at OCP she played a pivotal role overseeing District of Columbia government contracts. This involved managing, among other things, the bid advertising and selection process, price analyses, negotiations, and contracting. Crowell held this position until she left OCP in 2023.

Crowell admits that by early 2021 she was a member of the conspiracy with Ogbu and Oli. *See* ECF No. 8 at ¶ 11-12. The most profitable aspects of the multiyear scheme would come as a direct result of Crowell's corruption at OCP.

### iii. COVID-19 Testing Supplies Contract

The first highly lucrative contract the conspirators improperly obtained from OCP was for Highbury to provide the District's Department of Forensic Sciences ("DFS") with COVID-19 testing supplies (the "COVID-19 Testing Supplies Contract"). Crowell, in her role as an OCP contract specialist, managed the contract solicitation, offer, and award. *Id*. Before the solicitation was public, Crowell notified Ogbu and Oli of the upcoming contracting opportunity. *Id*. at ¶ 13. She shared internal, nonpublic pricing information with them. *Id*. The conspirators met and discussed how they could use Crowell's position to obtain the contract for Highbury. *Id*. at ¶¶ 13-14. And with Crowell's assistance from the inside, Highbury was awarded the contract.

The District of Columbia ultimately paid Highbury over $630,000 on the COVID-19 Testing Supplies Contract. *Id*. at ¶ 15. Oli, who served as Highbury's principal, gave Crowell at least $15,000 in cash to reward her for her misconduct at OCP. *Id*.

Text messages between Ogbu and Oli reflect the corrupt exchange. For example, on June 7, 2021, the District sent a $234,790.59 check to Highbury. On June 14, 2021, Oli took a picture of the check and sent the picture to Ogbu. Oli then asked Ogbu for his bank account details. Shortly thereafter, Oli wired $55,000 to Ogbu. In the text messages, Oli instructed Ogbu to give "5k" to Crowell. Oli further instructed that the money to Crowell had to be provided in cash. Within hours of receiving that message, Ogbu responded that he had delivered the money to Crowell and that "she says Thank You."

### iv. Nupath Dealings with OCP and Additional Benefits to Crowell

By the summer of 2021, Crowell was repeatedly using her position at OCP and access to nonpublic contracting information to identify opportunities for her and her co-conspirators to enrich themselves.

4

As reflected in Exhibit 2, when Crowell identified such an opportunity, she would often use her official OCP email address to forward nonpublic materials to her personal email account. She would then use her personal email account to forward the nonpublic information to Ogbu's personal email account.

Presumably to maximize the conspirators' ability to take advantage of Crowell's position, Ogbu created the Nupath Company in July 2021. On the evening of July 25, 2021, Ogbu forwarded to both Crowell and Oli confirmation from "Incfile" that the company had been created. *See* Ex. 3. Both Crowell and Oli acknowledged the email the next morning. Crowell stated, "I like it." *Id*.

On August 18, 2021, Crowell created a messaging group for her, Ogbu, and Oli. She dubbed it "The NuPath aka BIO," with "BIO" likely referring to B̲ridgette [Crowell], I̲fediora [Oli], and O̲binna [Ogbu]. *See* Ex. 4.[2] As shown in the group's messages, the trio met and discussed ways to use Crowell's inside information from OCP, and the existence of Highbury and Nupath, to coordinate on bid submissions to OCP. *Id*.; *see also* ECF No. 8 at ¶¶ 17-20. The messages show how Crowell would often drive the conversation. For example, on one occasion she expressed frustration with Oli for simply directly copying a bid submission from nonpublic information Crowell had taken from OCP. *Id*. Crowell directed her co-conspirator to "change it up or they will know it's copied." *Id*.

By October 2021, Crowell and Ogbu were seeking lucrative opportunities for Nupath without Oli's involvement (though Oli and Highbury continued to improperly benefit from previously awarded contracts with WMATA and OCP).

---

[2] Exhibit 4 is redacted to conceal personal identifying information. In the messages, "BCr" is Crowell, "Obi J" is Ogbu, and "Agu" is Oli.

On October 25, 2021, Crowell sent Ogbu pre-award nonpublic information about a contract with the District's Metropolitan Police Department (MPD). *See* Ex. 5. The contract was for obtaining Motorola "receive-only" earpieces for MPD officers. *Id.*; *see also* ECF No. 8 at ¶¶ 21-22. In one message between Crowell and Ogbu, Ogbu informed Crowell that they could buy the requested materials for $12,000, charge the District $22,000, and then the two could "clean out $10k even." *See* Ex. 5. That was not enough corrupt profit for Crowell. She responded, "Let's bill for 25k." *Id*. Once Ogbu expressed his agreement, Crowell wrote, "Ok cool[.] I will take care of it tomorrow." *Id*. As promised, Crowell used her position at OCP to get Nupath the contract. It was ultimately executed for $27,000. *See* ECF No. 8 at ¶ 22. Nupath did provide MPD with the requested earpieces. But as suggested in the text messages, the price MPD paid was artificially inflated by $15,000, which would lead to another windfall to Crowell for her corruption.

Crowell's most lucrative act of misconduct likely involved another MPD contract that she managed as part of her duties at OCP. Around the same time that MPD sought OCP's help obtaining the "receive-only" earpieces, MPD also sought OCP's help getting a private contractor to help MPD with pre-employment suitability background investigations for officer candidates (the "MPD Recruiting Outsourcing Verification Contract"). Again, Crowell shared pre-award nonpublic information with Ogbu about the contract. ECF No. 8 at ¶¶ 23-25. Though Nupath did not have the relevant experience or expertise to provide the requested (and important) services to MPD, Crowell and Ogbu used the confidential information to create and finalize a Nupath proposal that would undercut competing bids from more qualified contractors. Crowell then used her official position at OCP to finalize the contract between MPD and Nupath. *Id*. Crowell hid from both OCP and MPD that Nupath lacked the requisite abilities to obtain and perform the contract. *Id*. In communications between OCP and Nupath, Crowell and Ogbu also maintained a ruse to

6

prevent District employees from learning that they knew each other and were working together to obtain the contract. *See* Ex. 6.

Due to Crowell's corruption and fraud, over a two-year span the District paid Nupath close to $850,000 under the MPD Recruiting Outsourcing Verification Contract. ECF No. 8 at ¶¶ 23-24. Ogbu and Crowell attempted (but often failed) to satisfactorily carry out the duties required under the contract. During that time, they used friends and family members as Nupath employees. *Id*. They even created a fake Nupath employee name and e-mail address for Crowell to use so that she could conduct Nupath business with the District without District officials knowing who she was. *Id*.

Ogbu generally managed the Nupath bank account during the conspiracy. As part of the corrupt scheme and agreement between the conspirators, he used Nupath funds (received through fraudulently obtained contracts with OCP) to reward Crowell (for identifying and procuring the OCP contracts). Payments to Crowell included as much as $10,000 in cash *per month*, $20,000 to help Crowell buy a Ford Bronco Sport, over $35,000 to help Crowell with closing costs on a new home, and even a long weekend trip for Crowell and Ogbu to Cabo San Lucas in Mexico.

### b. Crowell's Efforts to Conceal

Crowell took numerous steps to conceal the conspiracy. Those steps included: falsifying ethics disclosure forms; providing false and misleading certifications in bid submission "bidder/offeror" assurance forms; and lying to special agents from the Federal Bureau of Investigation ("FBI") when she was first approached and asked about her criminal conduct. ECF No. 8 at ¶ 26.

### c. Procedural Background

The federal investigation into this matter began after WMATA's Office of Inspector General ("WMATA-OIG") was informed of potential misconduct by Ogbu at WMATA. As more information was learned, WMATA-OIG and the FBI were joined in their investigative efforts by the District of Columbia's Office of the Inspector General ("DC-OIG"). By late 2023, investigators had clearly identified Crowell, Ogbu, and Oli as co-conspirators working through Highbury and Nupath to corruptly obtain business with the District and WMATA.

In February 2024, investigators approached the three co-conspirators while executing court-approved search warrants at their respective residences. After the searches, each co-conspirator obtained counsel. Following discussions with the Government, they each agreed to a pre-indictment resolution. Crowell was the second individual to plead guilty. On June 6, 2024, she entered into a plea agreement with the Government and pled guilty to a one-count Information charging her with conspiring to commit money, property, and honest services wire fraud, in violation of 18 U.S.C. § 1349. Her sentencing hearing is currently scheduled for October 21, 2024. She will be the first of the three conspirators to be sentenced. Given their comparable levels of culpability, the sentence imposed for Crowell will set an important marker for the sentences to be imposed on Oli and Ogbu.

## II.   SENTENCING FRAMEWORK

To determine Crowell's sentence, the Court should first calculate the applicable federal advisory guideline range for the offense. *See Gall v. United States*, 552 U.S. 38, 49-50 (2007). Because that guideline range is meant to "secure nationwide consistency" and is "the product of careful study based on extensive empirical evidence derived from the review of thousands of

individual sentencing determinations," that range should serve as an "initial benchmark" for the sentence. *Id.* at 47-50.

After determining the guideline range, the Court must consider the various factors set forth in 18 U.S.C. § 3553(a). The factors include: the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the offense and promote respect for the rule of law; the need for the sentence to afford adequate deterrence; and the kinds of sentences available and need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. *See generally* 18 U.S.C. § 3553(a). The inquiry is focused on fashioning a sentence that is "sufficient, but not greater than necessary" to advance the § 3553(a) factors, which in turn reflect the purposes of punishment. *Id*.

### III.     AGREED-UPON GUIDELINE ANALYSIS

The parties agree on the sentencing guideline analysis applicable in this case. *See generally* ECF No. 7 at 2. The Presentence Investigation Report ("PSR") agrees with the calculation. *See* ECF No. 13 at 9-10.

The applicable guidelines are:

| Base Offense Level | U.S.S.G. §2B1.1(a)(1) | 7 |
| Loss Exceeding $150,000[3] | U.S.S.G. §2B1.1(b)(1)(F) | +10 |
| Abuse of a Position of Public Trust | U.S.S.G. §3B1.3 | +2 |
| Obstructing or Impeding Justice | U.S.S.G. §3C1.1 | +2 |
| Acceptance of Responsibility | U.S.S.G. §3E1.1 | -2 |
| Timely Notice of Acceptance | U.S.S.G. §3E1.1 | -1 |

---

[3] The parties agree that the loss amount attributable to Crowell's criminal conduct is more than $150,000. The Government informed the Defendant that in light of her pre-indictment guilty plea, the Government would not take further investigative steps to determine how much more than $150,000 the loss amount should be.

9

| Zero-Point Offender Adjustment | U.S.S.G. §4C1.1 | -2 |
|---|---|---|
| **TOTAL ADJUSTED OFFENSE LEVEL** | | **16** |

A Total Adjusted Offense Level of 16 at a Criminal History Category I places Crowell's guideline range at 21-27 months of incarceration.

## IV. THE SECTION 3553(a) FACTORS SUPPORT A GUIDELINE SENTENCE

### a. The Sentence Imposed Must Reflect the Seriousness of the Offense

For multiple years, Crowell abused a position of public trust to enrich herself and her co-conspirators. This was not a crime of necessity or passion. It was a crime of greed, motivated by Crowell's desire to supplement her OCP salary with tens of thousands of dollars, a new house, a new car, fancy vacations, and the like. Willfully participating in corruption and fraud were her means of achieving those ends. As reflected in some of her contemporaneous text messages, her actions were full of hubris and blatantly unethical.

The District of Columbia's Office of Contracting and Procurement plays an important role for the District and its citizens. The Office's publicly available Code of Ethics reflects its laudable purpose—and juxtaposing that code with Crowell's conduct highlights the egregiousness of her breach. Among other things, Crowell disregarded OCP's commitment to: "the highest ideals of honor and integrity in all public and personal relationships in order to merit the respect and inspire the confidence of the organization and the public being served"; a "[belief] that personal aggrandizement or personal profit obtained through misuse of public or personal relationships is dishonest and not tolerable"; "identify[ing] and eliminat[ing] participation of any individual in situations where conflicts of interest may be involved"; and a "[belief] that members of OCP should, at no time and under no circumstances, accept, directly or indirectly, any gifts, gratuities,

or other things of value from suppliers, which might influence or appear to influence purchasing decisions."[4]

Crowell's conduct was an unabashed assault on the sort of institution that OCP strives to be, and the sort of institution the District's citizens deserve it to be. Even though she and her co-conspirators sought to perform on the fraudulently obtained contracts, they did so at a tremendously inflated value in order to enrich themselves. In both the legal and colloquial sense, Crowell deprived OCP of her honest services and stole from the District. That is serious criminal conduct. The sentence imposed in this case must reflect the gravity of her offense.

Respectfully, the Probation Department's recommendation that Crowell be sentenced to a term of probation utterly fails to reflect the seriousness of her conduct and the nature of this conspiracy. *See generally* ECF No. 14. This crime was not a momentary lapse in judgment or passing hiccup. Crowell agreed to and played a key role devising and executing a scheme to methodically defraud a government organization for years. And for years she reaped material benefits from her corruption. Sentencing Crowell to an entirely noncustodial sentence would not sufficiently address the seriousness of her criminal conduct. It would also set a harmful precedent that white collar defendants of all sorts will gladly point to in the future; minimizing the seriousness of the fraud and corruption in this case will only lead to attempts to minimize the seriousness of fraud and corruption in other cases in the future.

### b. The Sentence Imposed Must Afford Adequate Deterrence and Promote Respect for the Rule of Law

The sentence in this case must sufficiently dissuade other public officials from engaging in similar corruption. It must also dissuade those who seek to do business with government agencies

---

[4] District of Columbia Office of Contracting and Procurement, "Code of Ethics", https://ocp.dc.gov/page/code-ethic (last visited Oct. 9, 2024).

from pursuing fraud and encouraging official misconduct. No current or future District employee or contractor should think that they can enrich themselves in such a manner without being held accountable and subject to a significant custodial sentence. Given the corrupt nature of the criminal conduct at issue, any sentence that fails to provide adequate general deterrence would likewise fail to promote respect for the rule of law.

It is unlikely that Crowell herself will ever be given another position of public trust in the District. But Crowell participated in both sides of the fraud—that is, as a government employee at OCP and as a private (albeit fake) person doing business as Nupath. While she may never again be able to corrupt a District agency from the inside, she should be deterred from participating in future fraud in any capacity.

A guideline sentence is sufficient, but not greater than necessary, to address the deterrent purposes of sentencing and promote respect for the rule of law. Imposing an entirely noncustodial sentence in this case would have the opposite effect. As described above, any attempts to minimize the seriousness of Crowell's misconduct in this case is sure to be used by future white collar defendants. Perhaps even more troublingly, a sentence of probation in this case would do virtually nothing to deter government officials from engaging in corruption in the first place.

For years, Crowell benefited from this conspiracy. While she may have mismanaged the large sums of money she made from the scheme, for months on end she pocketed tens of thousands of dollars in criminal proceeds. A government employee today looking at the extent of Crowell's misconduct and seeing it addressed through probation might very well decide that the reward is worth the risk. That is not deterrence, and that would not promote respect for the rule of law.

### c. The Sentence Imposed Must Avoid Unwarranted Sentencing Disparities

The Government credits Crowell for accepting responsibility and doing so prior to being indicted. But her decision did not come in a vacuum. By the time law enforcement approached Crowell, the Government had overwhelming evidence of her guilt. In exchange for her early guilty plea to one count of conspiracy, the Government agreed to cease further investigation, which would have included additional investigative steps demonstrating the extent of the loss to the District and its citizens from Crowell's substantive crimes. Thus, in certain ways, her current Total Adjusted Offense Level of 16 already reflects a reduction in the sorts of sentences available.

Crowell's offense level, even after factoring in acceptance of responsibility credit and the zero-point offender adjustment, is still within Zone D. The guidelines instruct that "If the applicable guideline range is in Zone D of the Sentencing Table, the minimum term shall be satisfied by a sentence of imprisonment." U.S.S.G. §5C1.1(f).

A guideline sentence of 21-27 months would be sufficient, but not greater than necessary, to avoid sentencing disparities with similarly situated defendants in recent comparable District of Columbia matters. For example:

- In August 2024, Judge Moss sentenced Vincent Forrest to 20 months imprisonment for his role in a corrupt scheme in which he used his position at MPD to provide non-public MPD information in exchange for cash payments.[5] Unlike Crowell, Forrest did not accept responsibility. His benefit from the corrupt scheme was over $15,000 in total. The evidence in this case suggests that there were many months alone in which Crowell received more than that in benefits for misusing her public position, which suggests that her criminal conduct is worse than his.

- In August 2024, Khin Phoo Ngon was sentenced in Superior Court to 23 months imprisonment after she pled guilty to defrauding a D.C. government assistance program

---

[5] Press Release, U.S. Attorney's Office for the District of Columbia, "Former MPD Officer Sentenced to 20 Months in Prison for Scheme that Sold Personal Data of Traffic Crash Victims" (Aug. 28, 2024), https://www.justice.gov/usao-dc/pr/former-mpd-officer-sentenced-20-months-prison-scheme-sold-personal-data-traffic-crash (last visited Oct. 9, 2024).

- of more than $240,000.[6] Although in that case the defendant was not a public official and pled guilty to local charges, she still received a custodial sentence of nearly two years.

- In July 2024, Judge Cooper sentenced Zhong Jie Chen to 18 months imprisonment after Chen pled guilty to wire fraud.[7] Chen's fraud of a government program was likely of a comparable loss amount to what Crowell has admitted to in her Statement of Offense. However, unlike Crowell, Chen did not abuse a position of public trust or conspire with others to carry out his fraudulent scheme.

- In February 2022, Judge Nichols sentenced Mohammed Hoque to 37 months imprisonment after he pled guilty to paying bribes to a collections chief at the District's Office of Tax and Revenue.[8] Hoque's profit from his corrupt scheme was roughly $84,000. This is about half of Crowell's admitted-to loss amount and much less than her personal profit. And, unlike Hoque, Crowell was a public official during the crime.

The PSR notes that in the last five years there were 515 defendants whose primary guideline was §2B1.1 and had a final offense level of 16 at a Criminal History Category I. *See* ECF No. 13 at 20. Notably—and at odds with the Probation Department's recommendation—85% of those individuals were sentenced to a term of imprisonment, and the median length of those terms was fifteen months. *Id*. Since §2B1.1 covers all sorts of fraudulent offenses, presumably many of those defendants were not convicted for abusing their official government position. Regardless, imposing a term of probation in Crowell's case would create an unwarranted disparity between her case and the overwhelming majority of cases covered by §2B1.1.

---

[6] Press Release, U.S. Attorney's Office for the District of Columbia, "Prison Sentence for District Woman Who Defrauded the STAY DC Tenant Assistance Program" (Aug. 9, 2024), https://www.justice.gov/usao-dc/pr/prison-sentence-district-woman-who-defrauded-stay-dc-tenant-assistance-program (last visited Oct. 9, 2024).
[7] Press Release, U.S. Attorney's Office for the District of Columbia, "Former Maryland Resident Sentenced in Theft of More than $350,000 in COVID-19 Relief Funds" (July 2, 2024), https://www.justice.gov/usao-dc/pr/former-maryland-resident-sentenced-theft-more-350000-covid-19-relief-funds (last visited Oct. 9, 2024).
[8] Press Release, U.S. Attorney's Office for the District of Columbia, "Business Owner Sentenced to 37 Months in Prison for Bribing Former Official at D.C. Office of Tax and Revenue" (Feb. 16, 2022), https://www.justice.gov/usao-dc/pr/business-owner-sentenced-37-months-prison-bribing-former-official-dc-office-tax-and (last visited Oct. 9, 2024).

### d. The Defendant's History and Characteristics

Crowell has no criminal history. This fact is accounted for in the application of the zero-point offender adjustment to her total offense level. With respect to the § 3553 factors, her lack of criminal history does not negate the seriousness of her offense and the need for adequate general deterrence.

Though Crowell is obligated under the terms of the plea agreement to not seek a downward departure, the Government expects that she will seek a significant variance based on her personal characteristics. No such variance is warranted.

It is undoubtedly tragic that Crowell has a young daughter who, through no fault of her own, is likely to suffer as a result of her mother's punishment. Crowell's criminal conduct is to blame for that reality—and, unfortunately, the risk that her incarceration might harm her family was not enough to dissuade Crowell from engaging in criminal conduct for years. Rather, it appears that the only thing that stopped Crowell from continuing her crimes was her departure from OCP and the end of the MPD Recruiting Outsourcing Verification Contract with Nupath.

Additionally, the Sentencing Commission has explained that "family ties and responsibilities are not ordinarily relevant in determining" whether a departure from a guideline range is appropriate. *See* U.S.S.G. §5H1.6; *see also id.* at Application Note 1(B) ("The fact that the defendant's family might… suffer to some extent from the absence of a parent through incarceration is not in itself sufficient as a basis for departure because such hardship or suffering is of a sort ordinarily incident to incarceration.").

Nor does Crowell's mental health history warrant a variance from the adjusted guideline range. The guideline principles are again instructive even if focused on departures as opposed to variances. The Sentencing Commission has explained that "Mental and emotional conditions may

be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." U.S.S.G. §5H1.3. Based on information provided by the Probation Department, Crowell does appear to suffer from some legitimate mental and emotional health issues. But those issues do not appear to be "present to an unusual degree [to] distinguish the case from the typical cases covered by the guidelines." *Id*. Nor do they excuse her knowing participation in a multiyear conspiracy.

## V.     FORFEITURE & RESTITUTION

As part of her plea agreement, Crowell has agreed to forfeit a Ford Bronco Sport that Ogbu helped her purchase with the proceeds of their corrupt scheme in 2021.

Crowell has also agreed to pay restitution in the amount of $100,000 to the District of Columbia. This obligation will be joint and several with her co-conspirators, who have also agreed to pay $100,000 in restitution to the District.

Beyond the above, the Government is not seeking further forfeiture, restitution, or a fine in this matter.

## VI.    CONCLUSION

To adequately address the seriousness of Crowell's criminal conduct and sufficiently deter others from corrupting government agencies, the Court should sentence Crowell to a guideline sentence of 21-27 months of incarceration, to be followed by two years of supervised release, along with the forfeiture of her Ford Bronco Sport and restitution in the amount of $100,000 to the District of Columbia.

                                      Respectfully submitted,

                                      MATTHEW M. GRAVES
                                      UNITED STATES ATTORNEY

By:    */s/ Timothy Visser*
        TIMOTHY VISSER (DC Bar No. 1028375)
        Assistant United States Attorney
        601 D Street, N.W.
        Washington, D.C. 20530
        (202) 252-2590
        timothy.visser@usdoj.gov